UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TRACEY PERKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| MAINE DRILLING & BLASTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Tracey Perkins, by and through the undersigned counsel, hereby complains

against Defendant Maine Drilling & Blasting, Inc. as follows:

**INTRODUCTION**

1.      This action is brought to remedy discrimination in violation of the Americans

with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C § 12101, et seq. and the Maine

Human Rights Act, 5 M.R.S.A. § 4551, et seq.

**JURISDICTION**

2.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 (federal

question) and 1343 (civil rights). In addition, it has jurisdiction over the state claims pursuant to

28 U.S.C. § 1367.

**VENUE**

3.      Pursuant to 28 U.S.C. 28 U.S.C. §§ 1391(b)(2) and 1391(c), venue is proper in the

District in which this Complaint is filed because Defendants' discriminatory conduct occurred in

Maine.

## ADMINISTRATIVE PROCEEDINGS

4.     Ms. Perkins has timely filed and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this Court under the ADA and thus all conditions precedent to this lawsuit within the meaning of Rule 9(c) of the Fed. R. Civ. P. have been performed or have otherwise occurred.

5.     Ms. Perkins filed a charge of discrimination with the Equal Employment Opportunity Commission and the Maine Human Rights Commission on June 15, 2015, within 300 days of the action complained of. Ms. Perkins received her right to sue notice form the Equal Employment Opportunity Commission dated May 11, 2016. (Exhibit A, attached). This lawsuit is timely filed within 90 days of that notice.

## JURY TRIAL DEMAND

6.     Plaintiff hereby demands trial by jury on all issues triable to a jury.

## PARTIES

7.      Plaintiff Tracey Perkins ("Ms. Perkins" or "Plaintiff") is an adult citizen, who at all times relevant to this Complaint has resided in Monmouth, Maine.

8.     Defendant Maine Drilling & Blasting, Inc., ("MDB" or "Defendant"), is a company with offices in seven different states, including Gardiner, Maine, where Ms. Perkins was employed.

9.     At all relevant times Ms. Perkins was a "qualified employee" as defined by 42 U.S.C. § 12111(8) of the ADA. Ms. Perkins was a qualified employee because she could perform the essential functions of her employment position with or without a reasonable accommodation.

10.     Defendant MDB was a "covered" employer as defined by 42 U.S.C. § 12111(5)(A) because it was founded in 1966, it engages in the business of drilling and rock

2

blasting in seven states, which affected commerce, and because it has had roughly 350 employees since 2014.

## STATEMENT OF FACTS

11.     From August 18, 2014 until March 9, 2015, MDB employed Ms. Perkins as its Accounts Payable Coordinator. On March 9, 2015, MDB informed Ms. Perkins that she was being terminated. Ms. Perkins continued to work at MDB until May 18, 2015.

12.     Ms. Perkins's job duties included, but were not limited to, coordinating and directing the accounts payable department, which included review of invoices and processing payments, updating procedures when necessary and limited policy and procedure review and creation.

### A.     Ms. Perkins Suffers From A Disability As Defined By The Americans With Disabilities Act, As Amended In 2008.

13.     On September 2, 2014, Ms. Perkins went to the emergency room because her feet, ankles, and knees had begun to swell, weaken, and sting. In addition, a pink and purple rash appeared on her legs and thighs, which became increasingly painful that evening.

14.     On September 3, 2014, Ms. Perkins saw a dermatologist who performed a biopsy and diagnosed her with acute necrotizing vasculitis. This condition causes inflammation of the blood vessel walls. This type of inflammation can cause a host of symptoms including, but not limited to, pain and weakness in muscles and joints and bleeding. It can also affect the brain and nervous system and cause difficulty moving and weakness in limbs.

15.     On September 7, 2014, Ms. Perkins returned to the emergency room because the rash and bruising remained and now covered her from her waist down. In addition, the pain in her legs had worsened significantly, becoming extreme.  At some point between September 3,

3

2014, and September 7, 2014, Ms. Perkins's diagnosis became more specific. She was diagnosed

with Henoch-Schonlein purpura, a condition related to necrotizing vasculitis.

16.     The ADA, as amended, establishes that "major life activity" and "substantial

limitation" are to be construed as broadly as possible, pursuant to 42 U.S.C. § 12102(4)(A).

17.     Pursuant to the ADA Amendments Act of 2008, what constitutes a major life

activity includes the operation of a major bodily function, "including but not limited to, functions

of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain,

respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(B).

18.     The legislative history to the ADA Amendments Act of 2008 states that

substantially limits means, "restricted as to the conditions, manner, or duration under which they

can be performed in comparison to most people." Managers Statement, 154 Cong. Rec. at S

8842. Making this determination relates, for example, to the way that individuals perform major

life activities, and to the time it takes to perform them. Statement Rep. Stark, 154 Cong. Rec. at

H8291; Statement of Rep. Courtney, 154 Cong. Rec. at H8296.

19.     Henoch-Schonlein purpura is a physiological condition caused by an individual's

abnormal immune system response. Henoch-Schonlein purpura causes inflammation of the

body's microscopic blood vessels, particularly those blood vessels in the skin, joints, kidneys,

and intestines. It is a disability as defined by the ADA, as amended in 2008, because it is a

physical impairment that substantially limits various major life activities in those who have it,

including normal cell and vascular functioning. In severe cases it can result in internal bleeding

and kidney disorder. It caused Ms. Perkins to suffer extreme pain in her feet and legs. It also

caused extreme difficulty, and at times made impossible, standing and walking. It also prevented

her from performing household tasks like cooking and cleaning and made showering and general

4

self-care exhausting. It prevented her from driving. These impairments were obvious and known to individuals Ms. Perkins interacted with, including but not limited to the people she worked with.

20.     On September 7, 2014, doctors placed Ms. Perkins out of work for seven days due to her physical condition resulting from Henoch-Schonlein purpura. She was also placed on three days bed rest during which time she was instructed to keep her feet above the level of her heart.

21.     Ms. Perkins returned to work on September 17, 2014. She continued to feel extreme pain in her legs and ankles and her ability to stand, walk, and move was obviously significantly limited. From September 2014 through November of 2014 Ms. Perkins could only wear loose fitting clothing due to the swelling of her lower body. She had to wear size 13 men's sandals and slippers due to the swelling of her feet. Her coworkers were aware of her condition and often laughed and joked about her wardrobe.

22.     During the weeks that followed, Ms. Perkins continued to suffer from Henoch-Schonlein purpura. Her legs remained swollen and painful, even though she was taking multiple medications and wearing boots and wrapping her legs as treatment. Standing and walking remained difficult and at times impossible. She could not drive. She could not care for herself or her home consistently without help. The disease caused her joints to stiffen. She began to suffer weakness in her legs and general fatigue. Her urine became progressively darker. She had numerous follow-up appointments with her physician through September and into October.

23.     On October 21, 2014, Ms. Perkins returned to the emergency room due to concerns about her increasing weakness and fatigue, dark urine, and rapid heart rate.

24.     On October 21, 2014, Ms. Perkins was admitted to the hospital. Doctors found a blood clot in her leg and in her lung. She was diagnosed with a pulmonary embolism on October

22, 2014. Tests also revealed that her kidneys were not functioning properly. She was diagnosed with an acute kidney injury and glomerulonephritis.

25.    Glomerulonephritis is a physiological condition that causes inflammation of the filters inside the kidneys. Also known as glomerular disease, it can be chronic or acute.

26.    Ms. Perkins remained hospitalized until October 28, 2014. She returned to work on November 3, 2014.

27.    On November 12, 2014, while Ms. Perkins prepared for work she became lightheaded and dizzy. She returned to the emergency room and was immediately admitted to the hospital.

28.    Doctors performed a kidney biopsy on November 14, 2014. As a result of the biopsy, Ms. Perkins was diagnosed with IgA-mediated nephritis. Doctors determined that IgA nephritis was causing Ms. Perkins's glomerulonephritis. Furthermore, medical research has shown that IgA nephritis and Henoch-Schonlein purpura are pathogenetically linked.

29.    In its active state, Ms. Perkins's physiological condition, IgA nephritis and resulting glomerulonephritis, is a disability as defined by the ADA, as amended in 2008, because it would substantially limit her in various major life activities, including limiting her renal and circulatory functioning. See 42 U.S.C. § 12102(2)(B).

30.    IgA nephritis/glomerulonephritis is a chronic kidney disease caused by a build-up of antibodies in the kidneys. The antibodies attack the blood vessels in the kidneys that filter waste and fluid from the blood. IgA nephritis can lead to end-stage kidney disease and kidney failure, which requires kidney transplant or dialysis to avoid death. There is no cure for IgA nephritis and it requires continuing care and treatment from a nephrologist.

6

31.     In addition, IgA nephritis/glomerulonephritis caused Ms. Perkins to suffer, and could continue to cause Ms. Perkins to suffer, from debilitating fatigue compared to most people. The fatigue substantially limited her ability to work, perform household chores like cooking and cleaning, and to get dressed and otherwise care for herself. It also required a restrictive diet.

32.     On November 17, 2014, Ms. Perkins was discharged from the hospital. She returned to work with a reduced schedule on December 1, 2014 and returned to work full time on December 8, 2014.

33.     On January 23, 2015, Ms. Perkins still suffered from leg weakness and pain so serious she was triaged to the emergency room for evaluation. Her chronic kidney disease continued to substantially limit her ability to walk and stand compared to most people.

34.     Ms. Perkins's IgA nephritis/glomerulonephritis required regular follow-up visits with her physician in December of 2014 and throughout 2015. At all times she complied with these treatments.

**B. MDB Terminates Ms. Perkins.**

35.     The ADA, as amended applies to Ms. Perkins claim of wrongful termination because the termination took place on or after January 1, 2009. Under that law, the disability must be assessed in its active state, not in remission, and without regard to mitigating measures like Ms. Perkins's medical treatments and medications.

36.     During the entire time Ms. Perkins was out of work obtaining medical treatment for Henoch-Schonlein purpura, IgA nephritis/glomerulonephritis, and pulmonary embolism, she kept her supervisors at MDB aware of her diagnosis, her physical impairments, and her need for continuing medical treatment.

37.     When Ms. Perkins missed work for a scheduled doctor's appointment she made sure to work extra time that week to ensure that she always worked 45 hours per week as her job required.

38.     On multiple occasions Ms. Perkins requested the reasonable accommodation of working from home, but MDB always denied those requests.

39.     The seriousness of Ms. Perkins medical condition was obvious to her co-workers, who regularly asked her how she was doing. Coworkers told her that they knew when she was coming and going because they could hear her "slow walk." Because she was unable to drive, she required transportation to and from work, which never interfered with her schedule. She brought an ottoman from home to work to help manage and alleviate the pain and swelling that her condition caused when she was sitting. She ate lunch at her desk to avoid navigating the stairs to the kitchen. She lost over 20 pounds and the medication she took for her kidney condition caused significant hair loss, both of which co-workers and supervisors noticed and commented on.

40.     For the entire time that Ms. Perkins was employed at MDB—over seven months—her physical impairments caused her to move slowly compared to others, and resulted in varying degrees of obvious physical discomfort. Frequently she became extremely fatigued.

41.     As a result of her physical impairment and the limitations it caused, Ms. Perkins missed a number of days of work. Her chronic condition required numerous trips to the emergency room and weeks of hospitalization. She spoke to her supervisors because she was concerned that her medical condition negatively affected how they perceived her as an employee.

42.     Even though MDB told Ms. Perkins not to worry about her medical condition negatively affecting how she was perceived, she still felt her supervisors viewed her negatively

compared to other employees because of her disability. One supervisor in particular repeatedly questioned her about when she would be able to drive. It was obvious that the supervisor had a problem with the fact that Ms. Perkins's condition made her unable to drive, even though Ms. Perkins never had issues with arranging transportation to or from work. This same supervisor frequently watched through her office window as Ms. Perkins moved slowly, and with great and obvious pain, across the parking lot after being dropped off in the morning.

43.     By December, 2014, Ms. Perkins had exhausted all of her sick time. Her only remaining vacation days had to be used on mandatory office holidays. As a result, any additional time out of the office for doctor's appointments or to manage her condition required her to "pay back" MDB for the missed time.

44.     Ms. Perkins requested to work in the office during the mandatory office holidays so she could preserve the few remaining vacation days she had and use them to cover days missed due to her condition. MDB denied this request because no one else would be in the office to "watch her." MDB also denied her request to work from home on these days.

45.     In early 2015 Ms. Perkins's physical condition began to improve slowly. However, she still believed she was being treated differently than other employees because of her disability and physical impairment.

46.     Ms. Perkins learned that when she was hospitalized, MDB held an administrative meeting with employees to discuss the donations the company typically made to families during the holiday season. During the meeting one employee suggested that a donation be made to Ms. Perkins since she had been sick and unable to work. Many other employees agreed with the suggestion. Ms. Perkins's supervisors had final approval over the donations, however, and declined to include Ms. Perkins.

9

47.     One day MDB closed its office due to snow and issued instructions on how to work from home. Ms. Perkins discovered that the instructions for working from home previously had been provided to other employees who requested accommodations when they or their family members were sick. Ms. Perkins's requests to work from home to accommodate her condition were always denied.

48.     In January of 2015 Ms. Perkins learned that when other MDB employees had gotten sick and been out of work, co-workers were allowed to transfer vacation time to the sick employee to assist. This was not offered to her.

49.     At some point in the winter of 2015 Ms. Perkins attended an Accounts Payable department meeting with three other individuals, including her supervisors. In the meeting one supervisor told them that "everyone was looking at AP" and that they all needed to be careful with their work, and that "shit would roll downhill" if mistakes were made. Ms. Perkins was the newest member of the accounts payable department.

50.     Ms. Perkins began to feel like she was being set up to fail. She was not provided any training or guidance, even when she repeatedly requested assistance or raised questions about certain things that she did not fully understand. At times she was instructed to do things a certain way, and then told what she had done was wrong. During her employment Ms. Perkins made no more mistakes than any of the other, more senior employees in the accounts payable department. She frequently fixed coworkers' mistakes. Ms. Perkins was the only one who had a physical impairment.

51.     Despite this, Ms. Perkins took the initiative to update, correct, and streamline many of MDB's accounts payable processes. When she presented her changes and ideas to her superiors, however, they either rejected them outright or accepted but never implemented them.

52.     MDB treated Ms. Perkins differently than other employees because of her prior medical issues, physical impairment, and disability.

53.     During the entire time MDB employed Ms. Perkins she was never disciplined or written up. She never received any written or verbal warnings regarding performance issues.

54.     On the first weekend in March, 2015, MDB held a training retreat in New Hampshire. Attending the retreat was a hardship for Ms. Perkins due to her medical condition. It required extensive amount of walking and standing and little down time during which she could rest. As a result, she became fatigued. Furthermore, the food served was not within her dietary restrictions. It was obvious that Ms. Perkins physical impairment meant she had to exert significant effort compared to others to meet the demands of the training retreat.

55.     The Monday after the training retreat Defendant called Ms. Perkins to a meeting at 1 pm. Her supervisors were present at the meeting along with someone from HR. At the meeting Ms. Perkins was terminated. When Ms. Perkins asked why she was being terminated, she was told that "She was not a good fit" for the company and that "She did not have a sense of urgency" in her work.

## CAUSES OF ACTION
### COUNT 1
### (For Violation of the ADA)

56.     Plaintiff realleges and incorporates paragraphs 1-55 of this Complaint by reference.

57.     Defendant violated the ADA, as amended when it discriminatorily terminated Plaintiff's employment on the basis of her disability.

58.     Plaintiff is a qualified individual with a disability as defined in 42 U.S.C. § 12131. She could perform her job's essential functions with or without an accommodation.

59.     Plaintiff had a disability as defined by the ADA, as amended, of IgA nephritis/glomerulonephritis at the time Defendant terminated her employment. As detailed above, this physiological condition caused a physical impairment that substantially limited one or more major life activities.

60.     Plaintiff's history of IgA nephritis/glomerulonephritis and her history of Henoch-Schonlein purpura also constituted a "record of disability" as defined by the ADA, as amended, 42 U.S.C. § 12102(B).

61.     Defendant also regarded Plaintiff as an individual with a disability because it terminated her employment based on an actual or perceived physical impairment or mental impairment.

62.     To satisfy the "regarded as" prong of disability, a Plaintiff does not need to plead or prove that the impairment limits or is perceived to limit a major life activity.

63.     Plaintiff was treated less favorably than non-disabled employees.

64.     Upon information and belief Ms. Perkins was replaced by a non-disabled employee.

65.     Defendant's discriminatory conduct has caused and continues to cause Plaintiff to suffer substantial physical and mental/emotional distress and inconvenience.

<u>COUNT II</u>
**(For Violation of the MHRA)**

66.     Plaintiff realleges and hereby incorporates by reference Paragraphs 1-65 as if set forth in their entirety herein.

67.     At the time of her termination, Plaintiff was disabled within the meaning of the MHRA, 5 M.R.S.A. § 4553. Her IgA nephritis/glomerulonephritis is kidney or renal disease,

which is one of the specifically identified disabling conditions listed in 5 M.R.S.A. § 4553-A

(1)(B). Futhermore, Ms. Perkins had a record of these disabling conditions pursuant to 5

M.R.S.A. § 4553-A(1)(C), and was regarded as having or these disabling conditions pursuant to

5 M.R.S.A. § 4553-A(1)(D).

      68.    Defendant further intentionally and wrongfully discriminated against Plaintiff on

the basis of her disability in violation of the MHRA when it terminated Plaintiff because of her

disability.

**CLAIM FOR RELIEF**

Wherefore, Plaintiff seeks the following relief:

    a.    A declaration that her rights under the ADA were violated;

    b.    Any actual monetary losses sustained by the Plaintiff as a direct result of the
violations;

    c.    The interest on the amount described on the items listed above, calculated at the
prevailing rate.

    d.    Restoration and make-whole relief for the loss of any employment benefits or
other compensation denied or lost by the plaintiff;

    e.    Compensatory damages against the Defendant because of the past and future
physical and mental pain and distress and inconvenience caused by its
discriminatory actions;

    f.    Punitive damages because the Defendant acted with malice and reckless
indifference of her rights;

    g.    Attorneys' fees, litigation expenses and costs incurred in obtaining relief and
pursuing this action;

h.      Post judgment interest; and,

i.      Any other relief this Court deems just and proper.


                              Respectfully submitted,


Dated: July 27, 2016              */s/ Samuel S. Riotte*_____
                                  Samuel S. Riotte
                                  McTEAGUE HIGBEE
                                  Four Union Park
                                  P.O. Box 5000
                                  Topsham, ME 04086
                                  (207) 725-5581
                                  sriotte@mcteaguehigbee.com

                                  *Counsel to Plaintiff*